UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Shelly Rogers Hoffman,  :  Civil No. 1:15-CV-01516
         :
     Plaintiff, :  (Judge Kane)
         :  (Magistrate Judge Saporito)
  v.       :
         :
Carolyn W. Colvin,   :
Acting Commissioner of  :
Social Security     :
         :
     Defendant. :

REPORT AND RECOMMENDATION

## I. INTRODUCTION

The plaintiff Shelly Rogers Hoffman ("Ms. Hoffman"), an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits under Title II of the Social Security Act.  Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the

Federal Rules of Civil Procedure.  For the reasons expressed herein, we find that the final decision of the Commissioner of Social Security is supported by substantial evidence.  Accordingly, it is recommended that the final decision of the Commissioner denying Ms. Hoffman's claim be AFFIRMED, and Ms. Hoffman's request for relief be DENIED.

II.   BACKGROUND and PROCEDURAL HISTORY

Ms. Hoffman has a master's degree in classical archeology and previously worked in that field as a curator, collections manager, exhibitor, and field specialist until she was laid off on January 3, 2011. (Doc. 8-3 p. 65; Tr. 164); (Doc. 8-8 p. 6; Tr. 459).  Her records reveal a tragic history of both physical and sexual abuse, and she had the great misfortune of sustaining injuries in two separate motor vehicle accidents during the relevant period.  The first accident was on April 12, 2011, and the second was on April 6, 2012.  Ms. Hoffman testified that in the April 2012 accident she sustained a concussion, severe whiplash, and impact injuries to her lower back.  (Doc. 8-3 p. 78;  Tr. 177).  She was examined in a hospital emergency department but was not admitted to the hospital. Id.  Non-examining impartial medical expert William Cirksena ("Dr.

Cirksena"), whose testimony was limited to an evaluation of Ms. Hoffman's physical impairments, testified that one or both of these accidents could have exacerbated existing thoracic outlet syndrome but there is no evidence that either accident resulted in any new physical abnormality. (Doc. 8-3, pp. 32, 35; Tr. 131, 134).

Psychiatric records reflect that Ms. Hoffman's April 2011 accident resulted in a reoccurrence of severe Post-Traumatic Stress Disorder ("PTSD") symptoms that led to a period of inpatient psychiatric treatment at Haven Behavioral Health from April 23, 2011, through May 2, 2011. (Doc. 8-10 p. 52; Tr. 606). Upon discharge from inpatient treatment, Ms. Hoffman was immediately placed in an intensive outpatient program at Haven Behavioral Health. She was discharged from intensive outpatient treatment on May 19, 2011. (Doc. 8-10 p. 46; Tr. 600). It was recommended that Ms. Hoffman be seen at Berkshire Psychiatric for ongoing outpatient care. Dr. Mark Putnam also recommended that Ms. Hoffman undergo neuropsychiatric testing due to her significant problems with short term memory, processing, maintaining attention, work recognition, making eye contact, illegible handwriting, switching of words.

(Doc. 8-10 p. 48; Tr. 602).

On May 1, 2012, Ms. Hoffman filed a Title II application for disability insurance benefits.  In her application for benefits she alleged that the following conditions and symptoms limited her ability to work: PTSD; severe flashbacks; panic attacks; major depression; insomnia; right brachial plexopathy; anxiety; short term memory loss; word recognition processing problems; difficulty maintaining concentration and focus; post concussion syndrome; L4-L5 disc herniation; lumbar radicular compromise; neck soft tissue strain and sprain; left shoulder re-injury. (Doc. 8-8 p. 6; Admin. Tr. 459).  In her application for benefits she alleged that she became disabled on April 12, 2011, when she was forty-four years old.

On June 15, 2012, approximately two months after the second motor vehicle accident, Ms. Hoffman completed a function report form and pain questionnaire detailing her symptoms and limitations.  (Doc. 8-8, pp. 33-42; Tr. 486-495).  On these forms, Ms. Hoffman alleges that her illnesses, injuries or conditions affect her ability to lift, squat, bend, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, and

follow instructions.   Ms. Hoffman reported that she could walk approximately two miles on a flat surface if she is able to take breaks every fifteen minutes, and could not lift more than a gallon of water without exacerbating her symptoms.  She reported no difficulty handling changes in routine, or interacting with authority figures, and has an active social life, but admitted to difficulty concentrating for more than a few minutes, remembering written or spoken instructions, and dealing with stress.  She stated that her medications (Viibryd and Lorazepam) have been helping her tolerate some stress.  As far as her daily activities, Ms. Hoffman reported that on bad days she has difficulty with personal care tasks secondary to pain and limitation of her range of motion.

During her administrative hearing, Ms. Hoffman reported that she has difficulty focusing, concentrating, and processing new information which she attributes to a history of sixteen concussions during her lifetime, only two of which she claims occurred during the relevant period (in April 2011 and April 2012).   (Doc. 8-3 p. 72; Tr. 171).  The remaining fourteen concussions occurred throughout her childhood and early

adulthood.[1]  Id.

Ms. Hoffman also reported physical difficulty using her left arm and hand secondary to thoracic outlet syndrome.  Ms. Hoffman had bilateral transaxillary first rib resections followed by a course of physical therapy to relieve her symptoms. She alleges these measures did not alleviate all of her discomfort.

Ms. Hoffman alleged that she suffers from excruciating lower back pain that radiates to her buttocks and legs.  (Doc. 8-3 p. 83; Tr. 182). Her pain makes it difficult for her to sit for prolonged periods.  Id.  On July 11, 2012, Ms. Hoffman had an initial consultation with Dr. Nicholas A. DeAngelo ("Dr. DeAngelo").  On clinical assessment, Dr. DeAngelo noted:

> [Ms. Hoffman] has had extensive medical, interventional, and CAM therapy without relief.  She has been diagnosed with PTSD but states she had it since a child.  She has significant abuse history.  She has two separate MV insurance claims and one disability claim for her pain complaints. I reviewed her MRI and exam in detail.  She has a normal MRI with no significant abnormality.  There is[sic] no physical abnormalities.  Howevr[sic], there is a significant history of mental health disorder that most likely is the root of her pain. I cannot rule out malingering, somatoform, or factitious

_____

[1]Ms. Hoffman reported that at least one of the childhood concussions was sustained an a motor vehicle accident, and that one or more may have been sustained during a past abusive relationship.

disorders at this time.  She is not a candidate for medical or interventional therapy.  I recommend a comprehensive program such as Dr. Michael Clark's in John Hopkins University who may be able to provide an in depth neuropsychological examination.

(Doc. 8-14 p. 71; Tr. 925).  Based on Dr. DeAngelo's recommendation Ms. Hoffman was evaluated at John's Hopkins and was placed in a three-week inpatient pain treatment program from August 29, 2012, through September 17, 2012.  During this hospitalization Ms. Hoffman was tapered off her prescribed Lorazepam and Hydrocodone with no significant withdrawal symptoms.  (Doc. 8-14 p. 5; Tr. 930).  She was placed on Acetaminophen and Ibuprofen as needed for pain.  Id. Ms. Hoffman testified that she takes the following prescription medication for her conditions: Cyclobenzaprine (muscular pain); Duloxetine (depression, anxiety, nerve pain); Hydrochlorothiazide (high blood pressure); Methocarbamol (pain); Pantoprazole (GERD); Viibryd (depression); and Naproxen (joint and muscle pain).  Ms. Hoffman alleges that her medications cause the side effects of confusion, sleepiness, dry mouth, and weight gain.  (Doc. 8-3 p. 94; Tr. 193).  Dr. Cirksena reviewed Ms. Hoffman's medication regimen in combination with her medical records

and opined that Ms. Hoffman's medications, including their side effects, did not result in any limitation to Ms. Hoffman's ability to understand, remember, or carry out instructions, make work-related decisions, respond appropriately to co-workers or supervisors, or handle usual changes. (Doc. 8-3, p. 51-52; Tr. 150-151).

On June 15, 2012, Ms. Hoffman's psychotherapist (a licensed clinical social worker) Justine Lipstock ("LCSW Lipstock") completed a medical source statement. (Doc. 8-14 pp. 2-3; Tr. 856-57). LCSW Lipstock assessed that Ms. Hoffman's ability to understand, remember, and carry out instructions is affected by her impairments, and that it results in marked limitations in the following activities: understanding and remembering detailed instructions; carrying out detailed instructions; making judgments on simple work-related decisions. She also assessed that it resulted in "moderate" limitations in the following activities: understanding and remembering short, simple instructions; carrying out short, simple instructions. Next, LCSW Lipstock assessed that Ms. Hoffman's impairments limited her ability to respond appropriately to supervision, co-workers, and work pressures, and resulting in "marked"

difficulty responding appropriately to work pressures in a usual work setting, "moderate" limitations responding appropriately to changes in a routine work setting, and slight or no limitation in all other areas assessed. Last, LCSW Lipstock assessed that Ms. Hoffman's impairments result in a somewhat impaired memory, and slowed thought processing.

During the initial administrative review of Ms. Hoffman's claim, her physical impairments were evaluated by non-medical single decision maker Ngoc-Hanh Griffith ("SDM Griffith") and by State agency psychologist Richard W. Williams ("Dr. Williams"). (Doc. 8-4 pp. 8-11; Tr. 230-233).

SDM Griffith assessed that Ms. Hoffman retained the physical capacity to: occasionally lift and/or carry (including upward pulling) fifty pounds; frequently lift and/or carry (including upward pulling) twenty-five pounds; stand and/or walk (with normal breaks) for a total of six hours per eight-hour workday; sit (with normal breaks) for a total of six hours per eight-hour workday; push and pull without limitation except as shown for lift and/or carry; occasionally balance, stoop, kneel, crouch, crawl, climb ramps, climb stairs, climb ladders, climb ropes, and climb scaffolds. Id.

Dr. Williams assessed that Ms. Hoffman had medically determinable impairments that did not precisely satisfy the diagnostic criteria of listings 12.04 (affective disorder) or 12.06 (anxiety-related disorder), and that these disorders resulted in: a mild restriction of activities of daily living; mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and no episodes of decompensation. (Doc. 8-4 p. 7; Tr. 229). In her mental RFC assessment Dr. Williams opined that Ms. Hoffman had limitations in understanding and memory, sustaining concentration and persistence, and social limitations, but that the medical data did not establish a severity level of mental impairment that would prohibit employment. (Doc. 8-4 p. 11; Tr. 233).

On July 16, 2012, Ms. Hoffman's claim was denied at the initial level of administrative review. Ms. Hoffman submitted a written request for a hearing before an administrative law judge, and continued to develop the evidentiary record before her hearing took place.

On September 28, 2012, Ms. Hoffman's claim was reviewed by State agency orthopedic consultant Murari Bijpuria ("Dr. Bijpuria") during an

informal remand.  (Doc. 8-14 pp. 54-55; Tr. 908-09).  On July 2, 2012, Dr. Bijpuria completed a check-box physical RFC assessment.  (Doc. 8-14 pp. 43-50; Tr. 897-904).    Dr. Bijpuria noted a primary diagnosis of degenerative disc disease of the cervical and lumbar spine, and a secondary diagnosis of brachial plexopathy.   She assessed that Ms. Hoffman could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for about six hours per eight-hour workday; sit (with normal breaks) for a total of about six hours per eight-hour workday; push and/or pull without any limitation other than shown for lift/carry; occasionally balance, stoop, kneel, crouch, crawl, climb ramps, and climb stairs; never climb ladders, ropes or scaffolds; and, reach above her shoulders no more than occasionally.  Id.

On July 1, 2013, treating source Francis Gallagher ("Dr. Gallagher") completed a medical source statement.  (Doc. 8-16 pp. 60-65; Tr. 1012-1017).  Dr. Gallagher reported that Ms. Hoffman had been seeing him regularly for one year, and that her current diagnoses included chronic pain syndrome, fibromyalgia, Ehlers-Danlos syndrome, post-traumatic

stress disorder, depression, left shoulder injury (status post failed surgery).  He indicated that Ms. Hoffman complained of extensive pain exacerbated by activities especially in her left shoulder, and that her mood disorder and PTSD impact her emotional stability and ability to focus.  Dr. Gallagher reported that Ms. Hoffman had no history of pain and limitation of motion in any weight-bearing joint, but that she did have severe generalized pain in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet that is precipitated by changing weather, cold, fatigue, hormonal changes, movement/overuse, static position, and stress.  Dr. Gallagher estimated that Ms. Hoffman would be off task up to 25% or more of each work day.  As far as her physical limitations, Dr. Gallagher opined that Ms. Hoffman could: sit up to ten minutes at one time and sit for a total of less than one hour per eight-hour workday; stand more than two hours at one time and for a total of more than six hours per eight-hour workday; walk without limitation; occasionally lift less than ten pounds and rarely lift up to twenty pounds; use her left hand to grasp, turn or twist objects 50% of the day, and use her right hand 100% of the workday;

and use her right arm for overhead reaching, but never use her left arm for overhead reaching.  Dr. Gallagher also estimated that Ms. Hoffman would be off task 50% of each workday, and miss work approximately four times per month as a result of her impairments or treatment.

Ms. Hoffman appeared and testified with the assistance of counsel during an administrative hearing held before Administrative Law Judge Reana K. Sweeney on May 29, 2014 (first administrative hearing).  Dr. Cirksena, a specialist in the fields of internal medicine and nephrology, also appeared and testified.  Specifically, Dr. Cirksena was asked to identify all of Ms. Hoffman's physical impairments of record that were demonstrable by medically acceptable clinical and laboratory diagnostic techniques, clarify the onset of Ms. Hoffman's thoracic outlet syndrome, and assess Ms. Hoffman's physical capacity.  Dr. Cirksena found that the following physical impairments were supported by medically acceptable clinical and laboratory diagnostic techniques: thoracic outlet syndrome (bilateral) and degenerative disc disease. (Doc. 8-3 p. 32, 34; Tr. 131, 133). He also testified that it was possible that Ms. Hoffman's thoracic outlet syndrome was present as early as April 2011, but was not confirmed by

diagnostic testing until October 2013. Id. Dr. Cirksena assessed that Ms. Hoffman could: stand (with normal breaks) six to eight hours per day; sit for six hours per eight-hour workday; occasionally lift, push, or pull twenty pounds; frequently lift, push, or pull ten pounds; stoop, kneel, crouch, squat, crawl, reach overhead with her left arm, and climb stairs without limitation; occasionally reach overhead with her left arm; and never climb ropes, climb ladders, or climb scaffolds. (Doc. 8-3 p. 39-42; Tr. 138-41).

The ALJ continued the hearing, and ordered that Ms. Hoffman undergo a consultative examination with a psychologist or psychiatrist.

On July 8, 2014, nontreating consultative examiner Margaret Boerio ("Dr. Boerio") evaluated Ms. Hoffman's psychiatric impairments and completed a narrative report and medical source statement.[2] (Doc. 8-34

---

[2] In the medical source statement, Dr. Boerio was asked to rate the level of Ms. Hoffman's impairment in several activities based on the following scale: none (absent of minimal limitation); mild (a slight limitation that allows the individual to generally function well); moderate (more than a slight limitation, that does not prevent the individual from functioning satisfactorily); marked (a serious limitation which results in a substantial loss in the ability to effectively function); and extreme (a major limitation that denotes no useful ability to function). (Doc. 8-34 p. 16; Admin. Tr. 2004).

pp. 4-18; Tr. 1992-2006).   In her medical source statement Dr. Boerio assessed that Ms. Hoffman's ability to understand, remember, and carry out instructions was affected by her impairments, and resulting in a "marked" limitation in the following activities: understanding and remembering complex instructions; carrying out complex instructions; and making judgments on complex work-related decisions. Dr. Boerio also assessed that Ms. Hoffman's impaired ability to understand, remember, and carry out instructions would result in "moderate difficulties in the following activities: understanding and remembering simple instructions; carrying out simple instructions; and making judgments on simple work-related decisions."   Dr. Boerio also assessed that Ms. Hoffman's psychiatric impairments limit her ability to interact with the public and responding to changes in the workplace.  Dr. Boerio opined that Ms. Hoffman would have "marked" difficulties: interacting with the public; interacting with supervisors; interacting with co-workers; and responding appropriately to usual work situations and changes in a routine work setting.

A second administrative hearing was convened before the ALJ on August 27, 2014.  Ms. Hoffman appeared and testified with the assistance of counsel.   Impartial vocational expert Sheryl Bustin appeared and testified at the second administrative hearing.

The ALJ denied Ms. Hoffman's application for benefits in a written decision dated September 4, 2014, because she found that Ms. Hoffman could adjust to other work that exists in significant numbers in the national economy. Ms. Hoffman requested review of the ALJ's September 2014 decision by the Appeals Council of the Office of Disability Adjudication and Review.   Together with her request for review Ms. Hoffman submitted additional evidence that was not before the ALJ when she issued her decision.   Documents that referred to the period of time relevant to Ms. Hoffman's   application for benefits were appended as exhibits 47F, 48F, 49F, 50F, 51F, and 52F in the administrative record. (Doc. 8-2 p. 2-6; Tr. 1-5); (Doc. 8-34 pp. 31-71; Tr. 2019-2059); (Doc. 8-35 pp. 2-58; Tr. 2060-2116); (Doc. 8-36 pp. 2-95; Tr. 2117-2210); (Doc. 8-37 pp. 2-102; Tr. 2211-2311).   The documents that pertained to a later time period were included in the administrative record with the written

decision of the Appeals Council.  (Doc. 8-2 pp. 10-101; Tr. 9-100).[3]

The Appeals Council denied Ms. Hoffman's request for review on June 2, 2015.

Ms. Hoffman initiated the instant action by filing a complaint on August 3, 2015.  (Doc. 1).  In her complaint, Ms. Hoffman alleges that the final decision of the Commissioner denying her claim is not supported by substantial evidence, and requests that the Court enter an order reversing the decision denying her application for benefits and award the claimant benefits effective April 12, 2011.  Id.

The Commissioner filed her answer to Ms. Hoffman's complaint on October 2, 2015.  (Doc. 7).  The Commissioner denies Ms. Hoffman's allegations of error and contends that the final decision denying Ms. Hoffman's claims is supported by substantial evidence.  Id.  Together with her answer, the Commissioner submitted a certified transcript of the

---

[3]Evidence submitted after the ALJ's decision cannot be used to argue that the ALJ's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589-594-595 (3d Cir. 2011).  Ms. Hoffman argues that the ALJ's decision is not supported by substantial evidence and does not raise the issue of whether remand is appropriate for the consideration of new evidence.  Therefore, this evidence is not relevant to this appeal and need not be considered.

entire record of administrative proceedings relating to this case.  (Doc. 8).

This matter has been fully briefed by the parties and is ripe for decision.  (Doc. 11); (Doc. 12).

III.   <u>STANDARD OF REVIEW</u>

A.   SUBSTANTIAL EVIDENCE REVIEW - THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  <u>See</u> 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the

evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."  <u>Leslie v. Barnhart</u>, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).  The question before this Court, therefore, is not whether Ms. Hoffman is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts.");  <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d

675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B.   INITIAL BURDEN OF PROOF, PERSUASION and ARTICULATION FOR THE ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 20 C.F.R. §404.1512; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r

IV.   ANALYSIS

In her brief, Ms. Hoffman raises thirteen arguments in support of her position that the final decision denying her request for benefits should be vacated and reversed pursuant to sentence four of 42 U.S.C. § 405(g) because it is not supported by substantial evidence.[4]  These arguments fall into three categories.  First, Ms. Hoffman argues that the ALJ did not properly evaluate her impairments at step three of the sequential evaluation process.  (Doc. 11 pp. 13-14)(Argument II); (Doc. 11 pp. 15-16)(Argument IV); (Doc. 11 pp. 16-17)(Argument V); (Doc. 11 pp. 17-18)(Argument VI); (Doc. 11 p. 20)(Argument X).  Second, Ms. Hoffman argues that the ALJ's decision is not supported by substantial evidence because she failed to properly evaluate the medical opinion evidence of record.  (Doc. 11 pp. 14-15)(Argument III); (Doc. 11 p. 18)(Argument VII);

---

[4]The first argument in Ms. Hoffman's brief (Argument I) is a general allegation that the ALJ's decision is not supported by substantial evidence.  It is subsumed by Ms. Hoffman's particularized objections to the ALJ's decision and need not be addressed separately by the Court.

(Doc. 11 p. 19)(Argument VIII); (Doc. 11 p. 20)(Argument IX).[5]  Third, Ms.

Hoffman argues that the ALJ's conclusion at step five of the sequential

evaluation process is not supported by substantial evidence.  (Doc. 11 pp.

20-21)(Argument XI);  (Doc. 11 p. 21)(Argument XII);  (Doc. 11 p.

22)(Argument XIII); (Doc. 11 pp. 22-24)(Argument XIV).

A.    THE ALJ'S DECISION DENYING MS. HOFFMAN'S CLAIM

In her September 2014 decision denying Ms. Hoffman's claim, the

ALJ found that Ms. Hoffman met the insured status requirement of Title

II of the Social Security Act through June 30, 2016.  (Doc. 8-3 p. 7; Tr.

106).  The ALJ then evaluated Ms. Hoffman's claim at each step of the

sequential evaluation process before concluding that Ms. Hoffman was not

under a disability, as defined by the Social Security Act, from April 12,

2011, through September 4, 2014 ("relevant period").

At step one the ALJ found that Ms. Hoffman did not engage in

substantial gainful activity during the relevant period.  (Doc. 8-3 p. 7;

Admin. Tr. 106).  At step two the ALJ found that Ms. Hoffman had the

_____

[5]Argument IX is misnumbered as Argument XI in Ms. Hoffman's

brief.

following medically determinable severe impairments during the relevant period: degenerative disc disease of the lumbar spine; thoracic outlet syndrome; major depression; and PTSD.  Id.  The ALJ also found that Ms. Hoffman had the following non-severe impairments: gastritis.  Id.  At step three the ALJ found that Ms. Hoffman did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

Between steps three and four of the sequential evaluation process the ALJ assessed Ms. Hoffman's RFC.  She found that Ms. Hoffman could perform light work as defined in 20 C.F.R. § 404.1567(b) except that:

> she must be allowed normal breaks (a 15 minute break, a 30 minute break, a 15 minute break, and one to two short unscheduled breaks).  The claimant is limited to occasional climbing of stairs or ramps.  She should never climb ropes, ladders, scaffolding, or poles.  The claimant is limited to occasional stooping, kneeling, crouching, and squatting.  She should never crawl.  The claimant should never work in darkness.  She should never operate a motor vehicle as part of her work.  The claimant is limited to occasional bilateral overhead reaching.  She should never be exposed to loud or very loud noise intensity levels.  The claimant should never be exposed to large vibrating objects or surfaces.  She should never work around or with hazardous machinery, sharp objects, and toxic or caustic chemicals.  The claimant should

25

never work in high exposed places.  She should never work around large fast moving machinery on ground.  The claimant should avoid direct interaction with the general public.  She is limited to occasional direct interaction with the general public.  She is limited to occasional direct interaction with supervisors and co-workers, such as working in teams.  Furthermore, the claimant should avoid work at production rate pace requiring constant pushing or pulling of materials.

(Doc. 8-3 pp. 9-10; Tr. 108-09).

The ALJ's conclusions at steps four and five were based on the above RFC, and informed by the testimony of VE Bustin.  VE Bustin testified that the mental demands of Ms. Hoffman's past relevant work exceeded her current RFC, with one exception.  VE Bustin testified that Ms. Hoffman could engage in her past relevant work as an editor, publications (DOT #132.037-022) as actually performed, but not as it is customarily performed in the national economy.  (Doc. 8-3 pp. 188-189; Tr. 217-218).  Out of an abundance of concern that the position of editor would require more social interaction that would be tolerable for Ms. Hoffman, the ALJ found in Ms. Hoffman's favor at step four.  (Doc. 8-3 p.  13; Tr. 112).  However, VE Bustin also testified that, given the above RFC and considering Ms. Hoffman's vocational factors, she could adjust to "other work" as: cleaner, housekeeper (DOT #323.687-014); bakery worker,

26

conveyor line (DOT #524.687-022); potato chip sorter (DOT #526.687-010); machine tender, laminator (DOT #569.686-046); and produce weigher (DOT #299.587-010).   (Doc. 8-3 pp. 119-120; Tr. 218-219).   VE Bustin provided the incidence of each position in the national economy, because Ms. Hoffman does not object to VE Bustin's statistical testimony it is not relevant to this appeal.   Based on this testimony, however, the ALJ concluded at step five that Ms. Hoffman could adjust to other work that exists in significant numbers in the national economy despite her impairments.   (Doc. 8-3 p. 13-14; Tr. 112-113).

## B.     ALLEGED ERRORS AT STEP THREE

At step three of the sequential evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments that are acknowledged to be so severe as to preclude substantial gainful activity.   20 C.F.R. §404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; Burnett, 220 F.3d 112, 119.  A diagnosis alone is insufficient to meet a listing.   20 C.F.R. §404.1525(d).

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations, and case law.  First,

if a claimant's impairment meets or equals one of the listed impairments, the  claimant is considered disabled per se, and is awarded benefits.  20 C.F.R. § 404.1520(d); Burnett, 220 F.3d at 119.   However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment the claimant bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment."  Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. §404.1520(d).  An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient.  Id.

Ms. Hoffman argues that the ALJ erred at step three of the sequential evaluation process because she failed to "properly" consider listings 1.04, 12.04, and 12.06, and failed to address listing 1.02.  Our review of the ALJ's written decision reveals that, with respect to her step three analysis of the musculoskeletal listings only, the ALJ did not provide a detailed discussion of the evidence of record that pertains to listing 1.04, and did not mention listing 1.02 at all.  Instead, she generally found that the "clinical findings necessary to meet or medically equal any

physical listing, including musculoskeletal listings, are not present," and summarized the requirements of listing 1.04 without discussing or explaining why Ms. Hoffman did not meet it.  (Doc. 8-3 p. 8; Tr. 107).  However, an ALJ is not required "to use particular language or adhere to a particular format" when evaluating a claim at step three of the sequential evaluation process.  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  The Third Circuit has noted that "ALJs need not cite specific Listings at step three as long as the ALJ's review of the record permits meaningful review of the step-three conclusions,"  and has upheld  an ALJ's decision that did not mention any listing because the ALJ's decision as a whole illustrated that the ALJ considered the appropriate factors in reaching the conclusion that a claimant did not meet the requirements of a listing.  Lopez v. Comm'r of Soc. Sec., 270 F. App'x 119, 121 (3d Cir. 2008)(citing Jones, 364 F.3d at 504-05).  In this case, for the reasons expressed herein we find that the ALJ's step three findings were sufficient because the decision as a whole illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Ms. Hoffman did not meet the requirements of either listing 1.02 or 1.04 of 20 C.F.R. Part 404,

Subpart P, Appendix 1.

With respect to the mental impairment listings, we find that Ms. Hoffman's argument that the ALJ did not "properly" consider listings 12.04 and 12.06 is meritless, as the ALJ provided ample discussion of the evidence that led her to conclude that Ms. Hoffman did not meet the paragraph B criteria of either listing.

1. REMAND IS NOT WARRANTED FOR THE ALJ'S FAILURE TO CITY LISTING 1.02 IN HER DECISION

Ms. Hoffman argues that the ALJ erred at step three of the sequential evaluation process because she failed to discuss listing 1.02B in the written decision denying Ms. Hoffman's claims.  (Doc. 11, pp. 13-14)(Argument II). As discussed above, this error does not warrant remand where, as here, the ALJ's decision as a whole illustrates that the appropriate factors were considered.

Ms. Hoffman argues that her left shoulder impairment must be evaluated under listing 1.02B (major dysfunction of a major non-weight bearing joint). To meet 1.02B a claimant must demonstrate, among other things, that her impairment results in the "inability to perform fine and

gross movements effectively, as defined by 1.00B2c." 20 C.F.R. Part 404,

Subpart P, Appendix 1 § 1.02A.   Section 1.00B2c of 20 C.F.R. Part 404,

Subpart P, Appendix 1 provides that:

> Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

(emphasis added).   In her decision, the ALJ noted that Ms. Hoffman

"showers, dresses, does laundry, washes dishes, does light cleaning, mows

the yard, and prepares meals with frequent breaks." (Doc. 8-3 p. 8; Tr.

107).   The ability to perform such tasks has been found to be inconsistent

with 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B2c.   See e.g.,

Lefevre v. Colvin, No. 3:12-CV-00787, 2014 WL 4293983 at *9 (M.D. Pa.

Aug. 9, 2014).   Accordingly, we find that the ALJ's discussion of Ms.

Hoffman's daily activities illustrates adequate consideration of the factors

31

relevant to listing 1.02A, therefore any error committed by failing to expressly discuss listing 1.02 is harmless.

### 2.   WHETHER THE ALJ'S EVALUATION OF LISTING 1.04 IS ADEQUATE

Ms. Hoffman argues that  that the ALJ erred at step three of the sequential evaluation process because she failed to "properly" discuss any objective medical evidence when she summarily concluded that Ms. Hoffman did not meet listing 1.04.  (Doc. 11 pp. 16-17)(Argument V).  She contends that she provided evidence of physical abnormalities in both her cervical and lumbar spine, and that the ALJ failed to adequately consider this evidence at step three.   (Doc. 11 pp. 15-16)(Argument IV).  We find that Ms. Hoffman's arguments lack merit.

With respect to her argument that the ALJ failed to discuss evidence in support of her conclusion that Ms. Hoffman's lumbar degenerative disc disease did not meet listing 1.04, we find that the ALJ's decision read as a whole illustrates that the ALJ considered the factors relevant to this listing.

Listing 1.04 addresses disorders of the spine (e.g., herniated nucleus

pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) that result in compromise of a nerve root (including the cauda equina) or the spinal cord, with: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); spinal arachnoiditis confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.[6]  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.

------

[6] "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having

The ALJ noted that:

> In terms of the claimant's alleged L4-L5 disc herniation and lumbar radicular compromise, Nicholas DeAngelo, D.O., a treating spine specialist, diagnosed the claimant as having degenerative disc disease of the lumbar spine (Exhibit 17F). James Guille, M.D., a treating orthopedist, noted that the claimant has low back pain and radiating leg pain which worsened after a motor vehicle accident on April 12, 2011 (Exhibit 3F).  Dr. Guille also noted that the claimant has positive straight leg raise testing (Exhibit 3F).  Despite the claimant's degenerative disc disease of the lumbar spine, the record from Reading Hospital and Medical Center, a treating medical provider, reveal that the claimant's motor strength to all extremities is strong and equal.  (Exhibit 1F).  Dr. Guille observed that the claimant has a normal gait and station (Exhibit 3F).  Jeffrey Hare, M.D., an examining radiologist, indicated that an MRI of the lumbar spine showed no posterior disc herniation, stenosis or neural impingement (Exhibit 3F).  Michael Thune, M.D., an examining radiologist, noted that another MRI of the lumbar spine revealed mild degenerative changes (Exhibit 9F).  Moreover, Dr. DeAngelo stated that the claimant's bilateral lower extremity strength is normal. (Exhibit 17F).

(Doc. 8-3 pp. 10-11; Tr. 109-110).  This discussion illustrates that the ALJ

considered the relevant factors in her decision as a whole that Ms.

---

insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)" 20 C.F.R. Part 404, Subpart P, Appendix 1 §1.00B2Bb(1).

Hoffman's lumbar degenerative disc disease did not meet listing 1.04.

With respect to Ms. Hoffman's allegations that the ALJ erred at step three by failing to discuss an MRI showing physical abnormality in her cervical spine, we find that any such error does not warrant remand in this case.  The definition section of listing 1.04 requires evidence of compromise of a nerve root or compromise of the spinal cord.  The cervical MRI cited by Ms. Hoffman does not show any nerve root compromise. (Doc. 8-19 p. 53; Tr. 1232).  As such, because there is no reasonable possibility that Ms. Hoffman's cervical spine meets listing 1.04, any error by the ALJ in failing to discuss this MRI in the context of listing 1.04 is harmless.

>   3.   WHETHER THE ALJ'S EVALUATION OF LISTING 12.04 AND 12.06 SUPPORTED BY SUBSTANTIAL EVIDENCE

Listing 12.04 pertains to affective disorders.  Affective disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. Part 404, Subpart P, Appendix 1 §12.04.  In this context "mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."

Id.  The required level of severity of this impairment is met when the requirements of in both section 12.04A and 12.04B of the listing are met.

Listing 12.06 pertains to anxiety related disorders.  "In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object of situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.  20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06.  The required severity of this impairment is met when the requirements of both 12.06A and 12.06B are met.

In this case, the claimant alleges that the ALJ's determination that Ms. Hoffman did not meet the requirements of 12.04B and 12.06B is not "proper."  (Doc. 11 p. 17)(Argument VI); (Doc. 11, p. 20)(Argument X).  We address these arguments together because section 12.04B and 12.06B are identical.  Sections 12.04B and 12.06B of the Listing of Impairments can only be satisfied when the claimant's affective disorder results in at least two of the following: "marked" restriction of activities of daily living; "marked" difficulties maintaining social functioning; "marked" difficulties

in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.[7] Id.

In her analysis at step three of the sequential evaluation process the ALJ found that, during the relevant period, Ms. Hoffman had: a mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties maintaining concentration, persistence, or pace; and one episode of decompensation of extended duration. (Doc. 8-3 p. 8; Tr. 107). As with her other step three arguments, Ms. Hoffman appears to attack the sufficiency of the ALJ's discussion at step three, while ignoring the ALJ's discussion of evidence at later steps of the sequential evaluation process. She argues that the ALJ "failed to explain how she was able to deny that Plaintiff met the listing despite medical

---

[7] The degree of limitation in the first three functional areas (activities of daily living, social functioning, and maintaining concentration, persistence or pace) is rated on the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). A "marked" limitation is not defined by a specific number of deficits in behaviors or activities, and instead is measured by the nature and overall degree of interference a particular impairment has on the claimant's ability to function in a particular area. See 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C1, 2, 3. The fourth functional area (episodes of decompensation) is rated on the following four-point scale: none, one or two, three, four or more. 20 C.F.R. § 404.1520a(c)(4).

records from multiple treating sources and testimony" regarding Ms. Hoffman's ongoing panic attacks, flashbacks, phobias, severe anxiety, paranoia, and history of abuse.  (Doc. 11 pp. 17-18)(Argument VI).  She also contends that Dr. Boerio and various other treating sources opined that Ms. Hoffman had "marked" limitations in activities of daily living, social functioning, and concentration, persistence, and pace.  (Doc. 11 p. 19)(Argument VIII; Doc. 11 p. 20 (Argument X).

We find that these arguments lack merit.  The ALJ's decision read as a whole illustrates that the ALJ considered the factors relevant to listings 12.04 and 12.06.  Specifically the ALJ noted that:

> In terms of the claimant's alleged mental impairments, Mark Putnam, M.D., a treating psychiatrist, diagnosed the claimant as having major depression and post-traumatic stress disorder (PTSD) (Exhibit 2F).  Dr. Putnam noted that the claimant has anxiety, flashbacks and hypervigilance (Exhibit 2F).  Dr. Putnam also noted that the claimant has decrease energy and problems with attention and processing (Exhibit 2F).  Furthermore Dr. Putnam stated that the claimant was in a partial hospitalization program from May 3, 2011 to May 19 2011 (Exhibit 2F).  On July 11, 2012, Dr. DeAngelo observed that the claimant has an irritable affect (Exhibit 17F).  Dr. Ramsay indicated that the claimant had an inpatient psychiatric hospitalization from August 29, 2012 to September 17, 2012 (Exhibit 18F).  Dr. Ramsay also indicated that the claimant has panic attacks and mild psychomotor agitation (Exhibit 18F).  However, Dr. Ramsay further noted that there

is no evidence of a formal thought disorder (Exhibit 18F). Despite the claimant's mental impairments, Dr. Putnam stated that the claimant denies any history of psychosis (Exhibit 2F).  Dr. Guille observed that the claimant has an appropriate mood and affect (Exhibit 3F).  Dr. DeAngelo indicated that the claimant is negative for anhedonia and paranoia (Exhibit 17F).  Moreover, Margaret Boerio, D.O., an examining psychiatrist, noted on July 8, 2014 that the claimant has organized and goal directed thought process (Exhibit 44F).  Dr. Boerio also noted that the claimant has intact attention and concentration (Exhibit 44F).

(Doc. 8-3 pp. 11-12; Tr. 110-111).

With respect to Ms. Hoffman's allegation that Dr. Boerio and various other "treating medical sources" opined that she had "marked" limitations in activities of daily living, social functioning, and concentration, persistence and pace, we find that her argument lacks merit.

In her medical source statement, Dr. Boerio rated Ms. Hoffman's ability to perform a series of basic mental work activities on a scale of none, mild, moderate, marked, and extreme.  Ms. Hoffman is correct that Dr. Boerio opined that she would have "marked" difficulty engaging in some individual activities.  But 12.00C1, 2, and 3 of 20 C.F.R. Part 404, Subpart P, Appendix 1 are clear that a marked impairment in one or more activities does not necessarily correspond to a "marked" limitation in one

39

of the broad functional areas of 12.04B and 12.06B.   As such, we find her argument lacks merit.

Furthermore, to the extent that her argument pertains to the opinions of "various other treating sources" this argument is not sufficiently developed to permit review.   As such, we find that it lacks merit.

### C.    WEIGHT OF THE MEDICAL OPINION EVIDENCE

Next, Ms. Hoffman alleges that there were several defects in the ALJ's assessment of the medical opinion evidence of record.

At the outset, our review of such determinations is limited to whether the ALJ's decision is supported by substantial evidence.   A reviewing court may not undertake a de novo review of the Commissioner's decision, and may not re-weigh the evidence of record. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis

and prognosis, and what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."   20 C.F.R. § 404.1527(a)(2).   RFC assessments completed during the initial steps of administrative review by nonexamining sources do not bind the ALJ on the issue of functional capacity but are considered as medical opinion evidence by nonexamining sources.  20 C.F.R. § 404.1527(e).   In deciding what weight to accord to competing medical opinions the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c).   "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2.  Generally, more weight will be given to a source who has examined the claimant than to a source who has not. 20 C.F.R. § 404.1527(c)(1). Treating sources are typically considered most able to provide a detailed, longitudinal picture of a claimant's medical impairments, and in some circumstances may be controlling.  20 C.F.R. § 404.1527(c)(2); see also  SSR 96-2p, 1996 WL 374188.

The Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to non-

controlling medical opinions like those in this case: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. § 404.1527(c).  Where the medical opinions of record conflict "the ALJ may choose whom to credit, but cannot reject evidence for no reason or for the wrong reason." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(internal quotations omitted).  In choosing to reject a treating physician's assessment, "an ALJ may not make 'speculative inferences from medical reports,'" Id., but the substantial evidence standard "includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck, 181 F.3d at 431.

### 1. WHETHER THE ALJ IGNORED THE MEDICAL SOURCE STATEMENT BY DR. GALLAGHER

In her decision, the ALJ accorded "limited" weight to the medical

source statement by Dr. Gallagher.   The ALJ explained that, "Dr. Gallagher's opinion that the claimant's lifting and carrying are limited to 20 pounds rarely is not supported by the record as a whole and is not consistent with Dr. Guille's observation that the claimant has no weakness or sensory deficit." (Doc. 8-3 p. 12; Tr. 111).   Ms. Hoffman alleges that the ALJ ignored the July 2013 medical source statement by treating source, Dr. Gallagher.   She argues that this error warrants remand because Dr. Gallagher assessed two work-preclusive limitations: that Ms. Hoffman would be off task 25% or more of each work day, and that Ms. Hoffman would be absent four or more days per month as a result of her impairments.[8]   (Doc. 11 pp. 14-15)(Argument III).   Ms. Hoffman essentially argues that the ALJ erred by failing to properly defer to the opinion of Dr. Gallagher under the treating physician rule.

As discussed above, the opinion of a treating source is entitled to controlling weight only where it is "well-supported by medically acceptable

---

[8]VE Bustin testified that an individual who is "off task" 25% of the workday would be precluded from engaging in any competitive work. (Doc. 8-3 p. 122; Admin. Tr. 221).   She also testified that an individual who missed work four times per month would precluded from engaging in any competitive work.   Id.

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record.   20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188.   In her brief, Ms. Hoffman alleges that the ALJ ignored the limitations identified by Dr. Gallagher and mischaracterized his treatment of Ms. Hoffman.   She fails, however, to cite any evidence in support of her position.

Our own review of the record reveals that the ALJ's position that Dr. Gallagher's medical source statement was neither "well-supported" nor "not inconsistent" with the record as a whole is supported by substantial evidence.   Dr. Gallagher's opinion about Ms. Hoffman's physical capacity was contradicted by two non-examining sources (Dr. Bijpuria and Dr. Cirksena), and his assessment about Ms. Hoffman's ability to maintain concentration and attendance is not consistent with the opinions of one non-examining source (Dr. Williams) and one non-treating source (Dr. Boerio).[9]   As such, we find that Ms. Hoffman's allegation that the ALJ

_____

[9] Dr. Williams assessed that the medical data did not establish a severity level of mental impairment that would prohibit employment, and that Ms. Hoffman was not significantly limited in her ability to maintain regular attendance.  (Doc. 8-4 p. 11; Admin. Tr. 233).   On mental status examination, concentration is assessed by tasks such as by having a claimant subtract serial sevens or threes from 100.  20 C.F.R. Part 404,

should have accorded controlling weight to the opinion of Dr. Gallagher is meritless.

2. WHETHER THE ALJ ERRED BY ACCORDING LIMITED WEIGHT TO DR. BOERIO'S MEDICAL SOURCE STATEMENT WHILE ACCORDING GREAT WEIGHT TO DR. WILLIAM'S RFC ASSESSMENT

In her decision, the ALJ accorded "limited" weight to the medical source statement by Dr. Boerio, and generally assigned "great" weight to the PRT assessment and mental RFC assessment by Dr. Williams.[10]  The ALJ explained that "Dr. Williams' opinion that the claimant has no worse than moderate limitations is supported by the record as a whole and is consistent with Dr. Boerio's statement that the claimant has organized and goal directed through process (Exhibit 44F)."  (Doc. 8-3 p. 12; Admin. Tr. 111).  Similarly, the ALJ concluded that, Dr. Boerio's medical source statement that "the claimant has marked restrictions are not supported

---

Subpart P, Appendix 1 §12.00C3.  Dr. Boerio observed that Ms. Hoffman was able to perform serial 7s from 100 quickly and accurately, and was able to do a money exchange problem.  (Doc. 8-34; Admin. Tr. 2000)

[10]In Argument VIII Ms. Hoffman refers to Dr. Boerio as a treating source, while in Argument VII Ms. Hoffman referred to Dr. Williams and Dr. Boerio as non-treating consultative examiners.  To clarify, Dr. Williams is a non-examining State agency consultant, and Dr. Boerio is a non-treating consultative examiner.

by the record as a whole and are not consistent with Dr. Boerio's statement that the claimant has intact attention and concentration." Id.; see 20 C.F.R. § 404.1527(c)(4)(explaining that the more consistent an opinion is with the record as a whole, the more weight it will be given); SSR 96-6p, 1996 WL 374180 at *2 (explaining that opinions from non-examining State agency psychologists can be given weight insofar as they are supported by evidence in the case record, and consistent with the record as a whole).

Ms. Hoffman argues that the ALJ should have given more weight to the medical source statement by Dr. Boerio, and less weight to the mental RFC assessment by Dr. Williams because Dr. Boerio's opinion was supported by the low Global Assessment of Functioning ("GAF")[11] scores

_____

[11]A GAF score is a numerical summary of a clinician's judgment of an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health on a scale of one hundred. See Diagnostic and Statistical Manual of Mental Disorders, 32-34(4th ed. text rev. 2000) (hereinafter "DSM-IV TR"). The Social Security Administration has recognized that a claimant's GAF score is not considered to have a direct correlation to the severity requirements. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, 50764-65 (Aug. 21, 2001). However, the administration has noted that the GAF is the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." Id. As such, it constitutes medical evidence accepted and relied upon by a medical

assessed by Dr. Putnam, Dr. Ramsay, the treating sources at Saint Joseph's Medical Center, the treating sources at Philhaven, and the treating sources at Berkshire Psychiatric and Behavioral Health Services. (Doc. 11 p. 18)(Argument VII); (Doc. 11 p. 19)(Argument VIII).   Her argument, however, ignores the fact that the record in this case included GAF scores that were both above and below 50.[12]

Ms. Hoffman's GAF scores during the relevant period ranged from a low of 21 (i.e., behavior considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment, or the inability to function in almost all areas) to a high of 65 (i.e., mild symptoms or some difficulty in social or occupational functioning but functioning pretty well).   The ALJ gave great weight to the GAF scores of 50 and above, and little weight to the scores below 50.   We note that most

---

source and must be addressed by an ALJ in making a determination regarding a claimant's disability.

[12] A GAF score between 41 and 50 indicates either serious symptoms, or the presence of a serious impairment in social or occupational functioning.   DSM IV TR at 34.   A GAF score between 51 and 60 indicates either moderate symptoms, or any moderate difficulty in social or occupational functioning.   Id.

of the GAF scores below 50 corresponded with periods when Ms. Hoffman began inpatient psychiatric treatment or were assessed during the months immediately following Ms. Hoffman's 2011 and 2012 automobile accidents.

In evaluating the medical opinion evidence of record, "the ALJ is not only entitled, but required to choose between" conflicting medical opinions. Cotter, 642 F.2d at 706. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo, 383 U.S. at 620. Moreover, "[I]n the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)(quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). Ms. Hoffman's only allegation of error is that, when faced with an extensive record illustrating that the severity and limiting effects of Ms. Hoffman's psychiatric impairment were variable throughout the relevant period, and generally improved with treatment, the ALJ chose to credit evidence illustrating that Ms. Hoffman's impairment was less severe than she alleged. Further, many of the same sources cited by

48

Ms. Hoffman as assessing GAF scores below 50 also assessed scores above 50.  As such, we find no basis to disturb the ALJ's findings.

Last, to the extent that Ms. Hoffman argues that Dr. Boerio's medical source statement, and the lower GAF scores of record, are consistent with a finding that Ms. Hoffman's mental impairments meet the paragraph B criteria of listings 12.04 and 12.06, we are not persuaded. As discussed above, Dr. Boerio opined that she would have "marked" difficulty engaging in some individual activities.  A "marked" impairment in a certain number of activities, however, does not correspond to a finding that Ms. Hoffman has met the criteria of 12.04B or 12.06B.  Similarly, a low GAF score has no direct correlation to the severity criteria under the Listing of Impairments.  <u>Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury</u>, 65 FR 50746-01, 50764-65 (Aug. 21, 2001).

  3.   WHETHER THE ALJ ERRED BY FAILING TO GIVE PROPER WEIGHT TO THE OPINION OF DR. GRIFFITH

Ms. Hoffman alleges that the "ALJ erred and abused her discretion in failing to give proper weight to the opinion of Dr. Griffith, who, Ms.

49

Hoffman argues, confirmed marked limitations for Plaintiff under 12.04 and 12.06. (Doc. 11 p. 20)(Argument IX). The body of her argument is one sentence, and alleges that "[t]he ALJ failed to explain why she did not give weight to the opinion of Dr. Bijpuria, who also confirmed marked limitations for Claimant under 12.04 and 12.06 consistent with the opinions of Claimant's treating sources, per Exhibits 10F." Id.

We find that this argument lacks merit. There is no "Dr. Griffith" in the record. To the extent that Ms. Hoffman refers to SDM Griffith – who assessed Ms. Hoffman's physical impairments at the initial level of administrative review – we similarly find that her argument lacks merit. "There is significant case law . . . that the RFC assessment of the SDM is entitled to no evidentiary weight." Yorkus v. Astrue, No. 10-2197, 2011 WL 7400189 at *4 (E.D.Pa. Feb 28, 2011). Thus the ALJ's failure to accord weight to SDM Griffith's physical RFC assessment was not error. To the extent Ms. Hoffman refers to Dr. Bijpuria's physical capacity assessment, we similarly find that her argument lacks merit. Dr. Bijpuria did not assess Ms. Hoffman's mental limitations, and therefore did not confirm any marked limitation under mental disorder listings 12.04B or

12.06B.

### D.   WHETHER THE ALJ'S DECISION AT STEP FIVE OF THE SEQUENTIAL EVALUATION PROCESS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Ms. Hoffman argues that the ALJ's determination at step five is not supported by substantial evidence.  Her argument is two-fold.  First, she argues that the ALJ's RFC assessment failed to account for all of Ms. Hoffman's credibly established limitations.  (Doc. 11 pp. 20-21)(Argument XI); (Doc. 11 p. 22)(Argument XIII); (Doc. 11 pp. 22-24)(Argument XIV).  Second, she argues that the ALJ's findings at steps four and five of the sequential evaluation process are internally inconsistent, and that this defect requires remand.  (Doc. 11 p. 21)(Argument XII).

### 1.   WHETHER THE ALJ ACCOUNTED FOR MS. HOFFMAN'S CREDIBLY ESTABLISHED LIMITATIONS.

One of the principal contested issues in this setting relates to the claimant's residual capacity for work in the national economy.  As discussed above, a claimant's RFC is defined as "the most [a claimant' can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments.  20 C.F.R. §404.1545.  In

making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. Id. Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all of a claimant's credibly established limitations into account is defective. See Rutherford, 399 F.3d at 554 n. 8 (noting that an argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC assessment is best understood as a challenge to the RFC assessment itself); Salles v. Comm'r of Soc. Sec., 229 F.App'x 140, 147 (3d Cir. 2007)(noting that an ALJ must include in the RFC those limitations which he finds to be credible).

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

As explained in <u>Rutherford</u>:

> Our cases have established some guidelines as to when a limitation is credibly established, and the governing regulations have something to say on that score as well (see especially Regs. §§ 945, 929(c) and 927). Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (<u>Burns</u>, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (<u>Plummer</u>, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993); Reg. § 929(c)(4)). Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. § 929(c)(3)).

399 F.3d at 554.

Ms. Hoffman alleges that her impairments result in several limitations that were not accounted for by the ALJ in her RFC assessment.[13]  She argues that the ALJ failed to include the following

---

[13]Ms. Hoffman also generally alleges that the ALJ failed to account for the following symptoms without discussing what limitations, is any,

limitations that Ms. Hoffman: needs more than "normal" breaks;[14] was limited to occasionally lifting less than ten pounds and rarely lifting up to twenty pounds (i.e., lifting restrictions commensurate with her treating physician's opinion); would be "off task" 20% of each workday; and would be absent four or more days per month.  Ms. Hoffman suggests that these limitations are medically supported by "numerous consistent opinions

_____

result from these symptoms: impaired concentration, persistence, and memory; anxiety; insomnia; fatigue; panic attacks; and flashbacks.  She also alleges that the ALJ failed to account for limitations associated with the following medical diagnoses, without discussing what limitations, if any, are the result of these impairments: thoracic outlet syndrome; and depression.  However, in assessing a claimant's RFC, it is the nature of the limitations resulting from a symptom or medical diagnosis that must be accounted for.  See SSR 96-8p, 1996 WL 374184 at *1 ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .  When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."); SSR 96-4p, 1996 WL 374187 at *2(distinguishing between "symptoms" and limitations).  As such, we find no basis to disturb the ALJ's RFC assessment based on Ms. Hoffman's generalized allegations that do not articulate any credibly established limitation that was omitted from the ALJ's RFC assessment.

[14]The ALJ defined "normal" breaks as two 15 minute breaks per day, one 30 minute break per day, and one to two short unscheduled breaks.

from treating sources." (Doc. 11 p. 23).  The only treating source to issue a medical source statement in this case was Dr. Gallagher.  As discussed above, the ALJ's assessment of Dr. Gallagher's medical source statement was done in accordance with the regulations, and the ALJ's decision to discount Dr. Gallagher's assessment is supported by substantial evidence. Dr. Gallagher's lifting restriction is contradicted by the opinions of two non-examining sources, and Dr. Gallagher's opinion that Ms. Hoffman would be "off task" during the workday and his estimation that Ms. Hoffman would be absent from work four or more days per month is contradicted by one non-treating source and one non-examining source. As such, we find that Ms. Hoffman's argument that the ALJ failed to account for these limitations lacks merit.

Similarly, we also find that Ms. Hoffman's argument that the ALJ failed to account for Ms. Hoffman's medication side-effects lacks merit. Ms. Hoffman testified that her medications cause the side effects of confusion, sleepiness, dry mouth, and weight gain. (Doc. 8-3 p. 94; Admin. Tr. 193).  Her testimony, however, is refuted by the testimony of Dr. Cirksena who reviewed Ms. Hoffman's medication regimen in combination

with her medical records and opined that Ms. Hoffman's medications, including their side effects, did not result in any limitation to Ms. Hoffman's ability to understand, remember, or carry out instructions, make work-related decisions, respond appropriately to co-workers or supervisors, or handle usual changes. (Doc. 8-3, p. 51-52; Admin Tr. 150-151).

In a similar case where a claimant alleged that medication induced drowsiness was disabling, the Third Circuit observed that, "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002). Like in Burns, there is evidence in the record supporting the ALJ's determination that Ms. Hoffman's alleged side effects of confusion and sleepiness do not result in any significant functional limitation. As such, we find that her argument lacks merit.

2. WHETHER THE ALJ'S CONCLUSIONS AT STEPS FOUR AND FIVE OF THE SEQUENTIAL PROCESS ARE INTERNALLY INCONSISTENT

Last, Ms. Hoffman argues that "[i]n paragraph 6, the ALJ opines

that Plaintiff cannot perform her past relevant work, which was performed at sedentary exertional level, and then in paragraph 10.[sic] finds that Plaintiff can perform the full range of work, which would necessarily include sedentary level work in terms of exertion, which causes inconsistency regarding the residual functional capacity assessment by the ALJ." (Doc. 11 p. 21)(Argument XII).  We find that Ms. Hoffman's argument lacks merit.

At the outset, we note that Ms. Hoffman's past relevant work included a mixture of "sedentary" and "light" occupations.  Further, and more importantly, the ALJ did not find that Ms. Hoffman could engage in a full range of light work.  Instead, she found that Ms. Hoffman could engage in a limited range of light work subject to additional exertional and non-exertional limitations.   See 20 C.F.R. 404.1569a (defining exertional and non-exertional limitations).

The terms "sedentary" and "light" only address the strength demands of jobs (sitting, standing, lifting, carrying, pushing, and pulling).  Although it is not well-explained in the ALJ's decision, as noted by the Commissioner in her response, the transcript of Ms. Hoffman's second

administrative hearing is clear that the ALJ's assessment that Ms. Hoffman could not engage in her past relevant work is based on her non-exertional, rather than exertional, limitations. In fact, VE Bustin testified that Ms. Hoffman could engage in one of her past occupations, but the ALJ rejected the VE's testimony on this issue out of concern that working in teams would place too many demands on Ms. Hoffman's ability to engage in appropriate social interactions – a non-exertional limitation. (Doc. 8-3 pp. 117-118; Admin. Tr. 216-217). Thus, to the extent that there is any conflict in the ALJ's conclusions at steps four and five, it is that the ALJ found in Ms. Hoffman's favor at step four despite compelling evidence that she could engage in one of her past occupations. As such, we find that her argument lacks merit.

## V.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that:

(1)   Judgment should be issued in favor of the Commissioner of Social Security and against Ms. Hoffman as set forth in the following paragraph;

(2)     The decision of the Commissioner of Social Security denying Ms. Hoffman's application for Disability Insurance Benefits should be AFFIRMED and Ms. Hoffman's request for relief should be DENIED; and,

(3)     The clerk of court should close this case.

 s/ Joseph F. Saporito, Jr. 
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: August 17, 2016

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Shelly Rogers Hoffman, | : | Civil No. 1:15-CV-01516 |
| | : | |
| Plaintiff, | : | (Judge Kane) |
| | : | (Magistrate Judge Saporito) |
| v. | : | |
| | : | |
| Carolyn W. Colvin, | : | |
| Acting Commissioner of | : | |
| Social Security | : | |
| | : | |
| Defendant. | : | |

<u>NOTICE</u>

Notice is hereby given that the undersigned has entered the foregoing Report and Recommendation dated August 17, 2016. Any party may obtain a review of this Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions

of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights.

 s/ Joseph F. Saporito, Jr.
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: August 17, 2016